BARNES, J.,
for the Court:
¶ 1. This appeal originates from a divorce action filed in the Chancery Court of Jackson County, Mississippi, between T.C. and Sheila Broome in 1993. For approximately eighteen years, the parties have litigated over the issues of property settlement and alimony. The case has spanned the tenure of three chancellors and included three prior appeals to the Mississippi Supreme Court. Additionally, a majority of the chancery court file was destroyed by Hurricane Katrina in August 2005, further stalling the case.
¶ 2. The instant appeal is of the chancellor’s detailed thirty-six page Findings of Fact and Conclusions of Law of October 12, 2009, which also served as the final judgment. The matters before the chancery court at the time, which relate to much of the case’s lengthy history, were T.C.’s motion for modification of alimony, and Sheila’s motions to strike modification and for sanctions against T.C. for violation *1135 of discovery requests. In her final judgment, the chancellor ruled T.C. was not barred by the doctrine of unclean hands and granted his motion to modify alimony, decreasing his alimony payment to Sheila from $3,000 to $1,500 per month. T.C. was also ordered to pay the arrearages for alimony that had accumulated from the date of the motion to this final judgment, or ninety-two months. T.C. also had to rectify the arrearages on pre-modification alimony and prior judgments, plus interest. Finally, Sheila’s motion for sanctions was denied.
¶ 3. T.C. now appeals, raising three issues. He argues the chancellor should have terminated alimony or reduced it consistent with his current ability to pay. Regarding arrearages, T.C. argues the chancellor did not follow the mandate of this Court’s 1997 opinion,[1] where he claims this Court awarded him an interest credit on payment he made to Sheila for various marital assets. Finally, T.C. contends the chancellor did not credit him for all of the payments he made on alimony arrearages and prior judgments. We affirm the chancellor’s judgment except regarding one matter-the calculation of arrearage as of February 2001. On this matter, we reverse and remand for proceedings consistent with this opinion.
STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
¶ 4. In December 1993, the Chancery Court of Jackson County granted Sheila a divorce from T.C. after approximately twenty-three years of marriage on the ground of uncondoned adultery. The parties had two minor children at the time of the divorce: a daughter, born in 1980, and a son, born in 1984. T.C. remarried, while Sheila remains unmarried.
¶ 5. A judgment in regard to the division of marital assets, child custody, child support, and alimony was entered in June 1995. Marital assets at the time of the divorce were valued. at approximately $1,000,000. The judgment awarded Sheila child support in the amount of $1,000 per month ($500 per month per child). The marital home, which was appraised at a value of $250,000, was also awarded to Sheila, and T.C. was required to pay off the remaining mortgage. The chancellor granted Sheila all home furnishings; some securities in the amount of approximately $10,000; thirty percent of T.C.’s sixty percent interest in T.C. Broome Construction Company (Broome Construction); thirty percent of a Merrill Lynch account valued at $154,000; and thirty percent of the $89,400 chancery settlement from a separate lawsuit involving Broome Construction (“M & W Settlement”).[2] T.C. was also required to obtain a $950,000 life insurance policy and name Sheila and the two children as beneficiaries.
¶ 6. The chancery court ordered T.C. to transfer thirty percent of his stock in Broome Construction to Sheila within thirty days of the judgment; granted him eighteen months from the date of the judgment to purchase Sheila’s interest at the fair market value as of the date of judgment; but gave him the option to pay Sheila for her thirty percent over eight years, during which time she would have an equitable lien against the assets of the company. The judgment further provided that while Sheila was not awarded permanent alimony, T.C. was to pay Sheila *1136 $3,000 per month alimony commencing June 1, 1995, and ending when he met the financial obligations of the judgment. Both parties appealed the judgment of divorce.
¶ 7. The judgment did not specify Broome Construction’s fair market value or how the valuation was to be made. T.C. decided to pay Sheila her thirty-percent interest in a lump sum. His company’s accountant calculated its value at $764,333.38 as of the date of the judgment. On June 20, 1995, T.C. paid Sheila $165,140, which he claims included her interest in Broome Construction ($137,580), the M & W settlement, and the Merrill Lynch account. Therefore, T.C. claimed he complied with the formal provisions of the judgment and did not have to pay alimony.
¶ 8. In an opinion issued in May 1997,[3] this Court held that the chancery court erred in not awarding Sheila periodic alimony, and reversed and remanded the case on the issue for a hearing to determine an appropriate amount of alimony. Additionally, this Court found that it was error for the chancery court to use T.C.’s own valuation of Broome Construction and that on remand the chancellor should use financial experts to determine the fair market value of the business as of the date of the divorce decree in December 1993. Further, the Court ordered Sheila to be compensated with interest on this amount from December 30, 1993, until the final resolution of the issue. Likewise, T.C. was to be credited with the $165,400 payment to Sheila, plus interest as of the date she was presented this check until final resolution of the issue.
¶ 9. The chancery court’s first special master appointed for the valuation was ultimately replaced by another special master, Haiddee Sheffield, who prepared Broome Construction’s valuation report. On June 30, 2000, the chancery court issued several judgments. Among other matters, the chancery court accepted Sheffield’s valuation of Broome Construction, which as of December 1993 was determined to be $962,000. Therefore, Sheila’s thirty-percent interest was $173,160, an increase in $35,580 from T.C.’s valuation and prior payment of $137,580. T.C. was credited with this prior payment, leaving a remaining balance of $35,580, together with eight-percent interest (the judgment rate) on the balance from July 1995 until paid in full. Additionally, the chancery court awarded Sheila $3,000 per month in permanent alimony, retroactive to the date of the divorce judgment in June 1995. The chancery court also ordered T.C. to surrender immediately all of his stock in Broome Construction to the registry of the court.
¶ 10. In December 2000, the chancery court entered an order upholding a 1996 contempt judgment for T.C.’s failure to pay certain financial obligations ordered by the court. Also in December 2000, the parties entered an agreed order stating that payment of the $35,580 by T.C. to Sheila would resolve all issues surrounding her interest in Broome Construction. However, no mention was made in the agreed order pertaining to interest; thus, the chancellor found interest eliminated by agreement.
¶ 11. In January 2001, two writs of garnishment[4] were served upon Broome Construction: one for permanent alimony, *1137 interest, and costs of $267,735.58; and a second for the 1996 order of contempt which was reiterated in the December 2000 order, totaling $119,629.38. In response to the garnishments, Merrill Lynch deposited $93,290.27 from T.C.’s account into the registry of the court. This left a remaining balance of $26,339.06 on the garnishment for the 1996 and 2000 orders. The chancellor found this deposit satisfied none of the alimony and only a portion of the arrearages.
¶ 12. In February 2001, Sheila filed a complaint for T.C.’s contempt[5] of the June and December 2000 orders. T.C. answered and counter-claimed for relief, requesting a reduction in his alimony payment due to a worsened financial position. In June 2001, the chancery court denied T.C.’s counterclaim for modification of his alimony payment, based upon the doctrine of unclean hands for his failure to pay numerous judgments, including alimony and other sums ordered to be paid by him.
¶ 13. In January 2002, the parties engaged in settlement negotiations. Among other matters, T.C. offered $313,339.06 to bring all past arrearages current. Sheila responded, in part, that she would accept this amount, with the condition that alimony would continue in the amount of $3,000 per month. Also, Sheila required that the settlement amount be paid by February 5, 2002. The record indicates the parties never reached a final agreement.
¶ 14. On March 2, 2002, T.C. sold his business for $2,400,000. T.C. received $400,000 as an initial payment for his interest in Broome Construction.[6] On March 13, 2002, thirty-six days after Sheila’s offer for settlement expired, T.C. paid $319,339.06[7] into the registry of the chancery court. He claimed this payment satisfied all judgments entered in the cause including all alimony owed up to March 2002. On the same date, T.C. filed a second motion for modification of his alimony payment based on his deteriorating health, which had forced him to retire.[8] On March 14, 2002, the chancery court acknowledged T.C. had “tendered payment toward the outstanding judgments in the amount of $319,339.06,” but not eliminating them, as T.C. claimed. (Emphasis added.) After a hearing on the matter, the court entered an order on March 20, 2002, releasing T.C.’s stock from the court registry and paying Sheila $319,339.06. On this same day, Sheila filed a motion to strike T.C.’s motion for modification, citing the doctrine of unclean hands.
¶ 15. A hearing was held on July 3, 2002, to determine whether T.C.’s March payment had satisfied his arrearage, thereby “cleansing his hands” and allowing a modification of alimony to proceed. Much of the argument and testimony centered around a compilation of the amounts that Sheila alleged T.C. still owed. All of the exhibits from this hearing, including this compilation, were lost in Hurricane *1138 Katrina. Without this exhibit, much of the transcript is difficult to follow.[9] The court took testimony from T.C. regarding his ability to pay alimony.
¶ 16. On August 7, 2002, the chancery court entered an order finding that T.C. presented evidence of severe medical problems and, therefore, should be allowed to proceed with the modification of alimony hearing. Further, the chancery court found “that any arrearage owed prior to the date of T.C.’s motion for modification was filed will be due and owing upon proper proof presented to this Court.” Sheila filed a motion to reconsider, which the chancery court heard on September 13, 2002.[10] The court denied the motion to reconsider and stated that the hearing on the merits of the modification of the alimony payment could continue.
¶ 17. On April 8, 2003, this Court issued an opinion[11] which was a consolidation of two appeals. This Court upheld the imposition of $15,000 in sanctions due to T.C.’s refusal to reveal documents that would show Broome Construction’s worth. Additionally, T.C. was found in contempt for his failure to obtain the $950,000 life insurance policy naming Sheila and the children as beneficiaries, as ordered in the June 1995 judgment of divorce. Finally, this Court upheld the alimony award of $3,000 per month that was part of the chancery court’s June 30, 2000 order.
¶ 18. In June 2009, a trial was held to conclude the matter of Sheila’s 2002 request for sanctions and T.C.’s 2002 request for an alimony modification. The chancellor’s October 12, 2009 Findings of Fact and Conclusions of Law thoroughly chronicles the long and complicated procedural history of the case. The chancellor ruled that due to T.C.’s deteriorating health and worsening financial situation, his alimony payment would be reduced from $3,000 to $1,500 per month, effective as of the date he had filed his motion to modify, which was on March 13, 2002. T.C. was ordered to pay the reduced alimony for ninety-two months from March 2002 until November 2009, equaling $138,000, plus interest. Then, T.C. was ordered to begin paying $1,500 per month alimony to Sheila on November 1, 2009. Before the reduced alimony took effect, however, T.C. would have to pay $71,134.66 that the chancellor found T.C. owed on previous judgments and alimony payments prior to the filing of his March 2002 motion for modification for a total of $137,831.35. Thus, the chancellor concluded T.C. was to pay into the chancery court registry, by November 1, 2009, a grand total of $275,831.35 (consisting of $138,000[12] in alimony arrearage from March 2002 until November 2009; $71,134.66 in previously owed judgments and alimony payments; and interest on the latter in the amount of $66,696.66). Sheila’s motion for sanctions regarding T.C.’s refusal to reply to discovery requests was denied. Both parties filed post-trial motions, which were denied.
*1139 STANDARD OF REVIEW
¶ 19. The standard of review in domestic-relations cases is limited. In re Dissolution of Marriage of Wood, 35 So.3d 507, 512 (¶ 8) (Miss.2010). The findings of a chancellor will not be disturbed “when supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong, clearly erroneous or an erroneous legal standard was applied. [Pjarticularly in the areas of divorce, alimony and child support, [an appellate court] will not overturn the [chancery] court on appeal unless its findings were manifestly wrong. For questions of law, our standard of review is de novo.” Id. (internal citations omitted).
ANALYSIS OF THE ISSUES
I.ALIMONY
1120. A brief recap of the procedural history of the alimony award is in order. Sheila was not originally awarded alimony in the divorce judgment of 1995, but T.C. was ordered to pay $3,000 per month in alimony starting June 1995 until he paid other financial obligations in the property settlement. In May 1997, this Court found error in not granting Sheila periodic alimony and remanded the matter to determine a specific amount. In June 2000, the chancery court awarded Sheila permanent alimony of $3,000 per month retroactive to the date of the divorce judgment in 1995. In February 2001, T.C. filed for a modification of alimony, but it was dismissed under the doctrine of unclean hands. In March 2002, T.C. filed his second motion for modification of alimony, after his payment of $319,339.06 in to the court registry for arrearages in the alimony payments and prior judgments.
¶ 21. T.C. claims he was never able to pay the amount of alimony awarded. He now argues the chancellor erred in merely decreasing his alimony from $3,000 per month to $1,500 per month; instead, T.C. contends the chancellor should have terminated his alimony obligation due to T.C.’s inability to pay.
¶ 22. Periodic alimony is subject to modification by increasing, decreasing, or terminating the award due to a material change in circumstances. Holcombe v. Holcombe, 813 So.2d 700, 703 (¶ 11) (Miss.2002). The material change must not be anticipated at the time of the original decree. Id. The Mississippi Supreme Court has articulated certain factors known as the Armstrong factors for determining the proper amount of alimony. Anderson v. Anderson, 692 So.2d 65, 70 (Miss.1997). The Armstrong factors are:
1. Income and expenses of the parties;
2. Health and earning capacity of the parties;
3. Needs of each party;
4. Obligations and assets of each party;
5. Length of the marriage;
6. Presence or absence of minor children in the home;
7. Age of the parties;
8. Standard of living of the parties both during the marriage and at the time of the support determination;
9. Tax consequences of the spousal support order;
10. Fault or misconduct;
11. Wasteful dissipation of assets by either party;
12. Any other factor deemed by the court to be “just and equitable” in connection with the setting of spousal support.
Id. (quoting Armstrong v. Armstrong, 618 So.2d 1278, 1280 (Miss.1993)).
¶ 23. In analyzing the Armstrong factors, the chancellor made the following determinations. T.C. listed his income on *1140 his 8.05 financial declaration form[13] at $2,852.40 per month based on disability and annuity payments he receives, which is a significant decrease from the time of the divorce. In addition, the annuity payments will terminate at some point. T.C. did not list the substantial settlement from his lawsuit as income, or his previous alimony obligations to Sheila as expenses. Sheila listed her monthly income at $1,244. Sheila is employed full time as a justice court deputy clerk. Her listed income excludes any alimony payment as she has not received any alimony payments from T.C. since 2002.
¶24. T.C.’s health has deteriorated in the years since the divorce. He had to retire in 2002 due to heart problems and thereby receives social security disability benefits. He has been hospitalized numerous times and is on many medications. The chancellor found T.C. has reached his current maximum earning capacity. While Sheila did not present any evidence of health problems to the court, she does not have a high earning capacity due to her age. She did not work during the majority of her marriage; thus, she was out of the workforce for over twenty years. The chancery court found Sheila had also reached her maximum earning potential.
¶ 25. Regarding day-to-day expenses, Sheila reported $2,772.06, and T.C. reported $3,028.66.[14] Both parties own their own home; neither party has a mortgage. T.C.’s wife works part time; thus, she can help with the expenses, while Sheila does not have the benefit of any spousal support. T.C. also recently received a substantial settlement regarding the sale of his formerly owned company. The Broomes’ marriage lasted twenty-three years, and while both children are now emancipated, Sheila still helps her son with a credit-card bill. In October 2009, Sheila and T.C. were fifty-seven and fifty-nine years old, respectively. During the marriage, the parties lived well. Sheila continues to pay taxes on alimony payments as income, and T.C. claims what he says is alimony expenditures on his tax return. Regarding fault or misconduct, T.C. originally filed for divorce, but Sheila was ultimately granted the divorce on the ground of T.C.’s uncondoned adultery. Importantly, since the original divorce judgment of 1995, the chancellor noted T.C. has avoided paying Sheila property settlements and later alimony ordered by the court, which has resulted in numerous contempt petitions. In fact, the chancellor stated that T.C. has never voluntarily made any alimony payments.
¶26. The chancellor found that even though T.C. was not the most sympathetic movant, he came to the court with clean hands,[15] and she would consider his motion to modify alimony. The chancellor found T.C. had an inability to pay the alimony payments from the time his motion to modify was filed in March 2002 until the trial in June 2009, based upon his financial declarations, medical issues, and testimony. While his financial situation *1141 did not relieve T.C. of his obligation to pay the court-ordered alimony, it did prevent a finding of unclean hands.
¶ 27. Downward modification of alimony was found appropriate by the chancellor due to T.C.’s material change in circumstances. The chancellor found T.C.’s standard of living dramatically decreased over the years since the divorce decree due to his poor health and advanced age. At the time of the divorce, T.C. was earning between $100,000 to $150,000 annually through his business; however, in 2002 he sold his business and retired due to his health. Yet, because of T.C.’s bad-faith dealings with Sheila in the past, the chancellor did not completely eliminate T.C.’s alimony obligation. The chancellor noted that a financial disparity remains between the parties, with Sheila still in a worse financial position than T.C. and nearing retirement age.
¶28. The chancellor has substantial discretion in reaching a decision in matters of this nature that will be both “equitable and fair to both parties.” Seale v. Seale, 863 So.2d 996, 999 (¶ 14) (Miss.Ct.App.2004). Here, the chancellor carefully considered the parties’ financial and other material changes over the years and fully analyzed each of the Armstrong factors. Further, the record fully supports the chancellor’s decision. Therefore, we find the chancellor did not abuse her discretion in reducing rather than eliminating T.C.’s alimony obligation.
II. INTEREST CREDIT ON T.C.’S PAYMENT OF $165,140
¶ 29. Next, T.C. argues that when the chancellor calculated the amount T.C. was in arrearage on various judgments and alimony payments, she did not properly credit him with interest on his $165,140 payment to Sheila for various marital assets. He states the payment satisfied Sheila’s thirty-percent interest in Broome Construction, the M & W settlement, and the Merrill Lynch account. He contends the chancery court did not follow the ruling of this Court’s May 1997 unpublished opinion regarding interest credit on this payment. He cites Horton v. Horton, 301 So.2d 305, 306 (Miss.1974) for the proposition that where the trial court fails to follow the supreme court’s mandate on remand, it is the duty of the supreme court to carry out its own mandate.
¶ 30. In the original divorce judgment in 1995, Sheila was awarded thirty percent of the following: interest in Broome Construction’s fair market value as of June 1995; the M & W settlement of $89,400; and the Merrill Lynch account of $154,000. The divorce judgment did not specify how the business’s fair market value was to be determined; so, T.C. had his accountant value the company. T.C. determined Sheila’s interest in the company was $137,580. T.C. was given the option of paying the amount in a lump-sum payment or over eight years; however, until he paid all of the above provisions, he had to pay alimony at $3,000 per month, beginning June 1995. T.C. claims he decided to pay Sheila a lump-sum payment in the amount of $165,140, and the record indicated he did so on June 20, 1995, in satisfaction of the above awards and in lieu of alimony. Therefore, T.C. unilaterally concluded that he had satisfied the divorce judgment. In the 1997 appeal to this Court, Sheila argued that T.C.’s valuation of the business was not accurate. This Court ruled that due to the “significant factual disputes ... and the absence of factual findings concerning the valuation of Sheila’s interest,” the matter was to be remanded to the chancery court and financial experts employed to value the business.
¶ 31. T.C. now argues that the chancellor erred in not crediting him with the *1142 interest that had accumulated on this payment which was awarded to him pursuant to this Court’s June 1997 opinion, which stated:
The fair market value of Sheila’s interest in T.C. Broome Construction Co. shall be calculated as of the date of the divorce decree, December 30, 1993. Sheila shall be compensated with interest on this amount, at the judgment rate, from December 30, 1993 until the final resolution of this issue. [T.C.] shall be credited with the $165,WO 'previously tendered to Sheila, plus interest at the judgment rate from the date of her presentment of the check until the final resolution of this issue of Sheila’s interest is conclusively established. Of course, such valuation may result in a finding that [T.C.] must tender additional sums to to Sheila, [or] that Sheila must return a portion of the $165,140 to [T.C.]....
(Emphasis added.) Thus, T.C. claims the amount of interest that accumulated from June 1995, when he paid Sheila $165,140, until June 30, 2000, when the chancery court accepted Special Master Sheffield’s valuation of the company of $962,000, amounted to $77,858.65. T.C. claims he should be credited this “award of interest” toward any outstanding arrearage.
¶ 32. We find this argument misplaced. As the chancery court recognized, our 1997 opinion anticipated that once Sheila’s interest in Broome Construction was determined, the whole amount would accrue interest at the legal rate from the June 1995 judgment, but T.C. was to be credited with his payment of $165,400 plus interest on that amount until final resolution of the issue. Therefore, T.C.’s credit for interest merely offset the accrual of interest to Sheila on her share of the business. Sheila would, therefore, have been entitled to $35,580 plus interest on that amount but for the agreed order. It is only because of the agreed order executed by both parties that Sheila is not entitled to interest on the $35,580. Even if T.C. had been entitled to any credit for interest on the amount he paid, the agreed order would have barred his claim, the same as it barred Sheila’s. The agreed order expressly stated that upon payment of $35,580 by T.C. to Sheila, all issues surrounding her share of the business would be resolved. Because the agreed order did not reference any interest that had or would accrue, the chancellor, in her final judgment, found the issue of interest was eliminated by agreement of the parties. We find the chancellor’s ruling in accord with this Court’s 1997 opinion.
III. CREDIT FOR ARREARAGES
¶ 33. T.C. disagrees with the chancellor’s findings of fact for credits given on his arrearages for prior judgments and alimony payments. Specifically, T.C. claims that his payment of $319,339.06 in March 2002 satisfied all alimony arrearag-es and outstanding judgments that existed at the time. T.C. also argues that he should have received credit for two garnishments in 1996 which resulted in the release of funds totaling $13,050. Finally, T.C. argues that his payment of child support after the children were emancipated, totaling $40,000, should be credited to his alimony arrearages. T.C. calculates that with his modified alimony of $1,500 per month from March 2002 until November 2009, he owes $138,000; however, with the credits of $13,050 and $40,000 and the “interest” credit of $77,858.66 previously discussed,[16] his total arrearages are only $7,091.34, and not $275,831.35, as the chancery court calculated.
*1143 A. T. C. ⅛ payment of $319,339.06
¶ 84. In her final judgment, the chancellor found that T.C.’s payment of $819,339.06 in March 2002 did not satisfy all of his alimony arrearages and outstanding judgments — he still owed $71,134.66 on alimony and judgments prior to filing his modification in March 2002. She arrived at this figure as follows. As of February 18, 2001, T.C. still owed $26,339.06[17] on the judgments and $294,074.64 on alimony to that date. The chancery court stated that neither party disputed these amounts. Therefore, the chancellor determined that T.C. owed $320,413.70 as of February 2001. After thirteen months’ interest (from February 2001 until March 2002), the total balance due was $348,353.78.[18] T.C. deposited $319,339.06 into the chancery court registry on March 13, 2002, the same date he filed his motion to modify alimony. On March 14, 2002, the chancery court released T.C. from garnishments stating that this payment went “towards” his arrearages, not eliminating them as T.C. argues.
¶ 35. The chancellor next determined how much T.C. was in arrearage as of the date of modification. T.C. had not made any alimony payments since the February 2001 determination of his arrearages. For thirteen months, from February 2001 until March 2002, alimony continued to accrue at $3,000 per month for a total of $39,000, plus interest at the judgment rate of eight percent, or $3,120, for a total of $42,120. Therefore, the total amount owing on alimony and judgments as of the date of T.C.’s petition for modification in March 2002 was $390,473.72 ($348,353.78 plus $42,120), less the $319,339.06 T.C. paid in March 2001, leaving a balance of $71,134.66. The chancellor added interest on the $71,134.66 which had accrued from March 2002 until November 2009, for ninety-two months ($66,696.69) making the total amount due November 2009 for prior judgments and alimony $137,831.35.
¶ 36. “Periodic alimony becomes fixed and vested on the date in which the payment is due and unpaid.” Gregg v. Montgomery, 587 So.2d 928, 933 (Miss.1991) (citing Bowe v. Bowe, 557 So.2d 793, 795 (Miss.1990)). “[A] court cannot give relief from civil liability for any payments that have already accrued.” Id. A payment vests and becomes a judgment against the payor. Brand v. Brand, 482 So.2d 236, 237 (Miss.1986). Pastdue payments of alimony bear interest from the date each became due by prior decree. Id. (citing Rubisoff v. Rubisoff 242 Miss. 225, 235, 133 So.2d 534, 537 (1961)).
¶ 37. T.C. argues that the chancellor’s findings of fact regarding the amount of alimony owed from February 2001 to March 2002 is in error. He claims the payment of $319,339.06 also covered the time period from February 2001 until March 2002, and Sheila’s 2002 tax returns show she claimed $249,000 in alimony, which is true. Yet, this fact does not prove that his payment fully satisfied all of his *1144 prior alimony arrearage and judgments. T.C. merely offers his own basic calculations of how the $319,339.06 paid all prior arrearages and judgments in full as of March 2002.
¶ 38. After carefully reviewing the chancellor’s calculations in this extremely complicated case, we have discovered one error in her computations. In her findings of fact, the chancellor found a total of $295,841.11 due as of February 2001. This number is comprised of “$267,735.58 (in alimony and interest) and $28,105.53 (remaining Judgment balance).” [19] (Emphasis added.) In her conclusions of law, however, in calculating the amount of T.C.’s arrearages, the chancellor stated: “As of February 18, 2001, $26,339.06 remained on the Judgments and $294,074.64 remained on the alimony.” (Emphasis added.) The chancellor had, however, already included the $26,339.06 “remaining in Judgments” to obtain the $294,074.64 figure.[20] As previously noted, the amount of “alimony and interest” as of February 2001 was found to be only $267,735.58. The chancellor included the $26,339.06 twice in her calculations. While the chancellor stated that neither party appeared to dispute these amounts, T.C. does dispute the overall calculation of the arrear-ages. Further, at the March 2002 hearing, counsel for T.C. argued that the payment of $319,339.06 should have satisfied all T.C. owed and that there was a $28,221.09 error in Sheila’s computations. This duplicate amount of $26,339.06 plus interest from February 2001 through November 2009 must be subtracted from the amount of T.C.’s final arrearage. Accordingly, we remand this case to the chancery court for calculation of this amount and correction of the $2,050.70 error in favor of T.C. previously identified.
¶39. We have thoroughly reviewed the submissions by the parties and cannot find that any of the concerns addressed by the separate opinion were raised as errors by the parties in this appeal. We discuss briefly, however, the primary issue of interest on alimony. As the separate opinion notes, the June 2000 order did order permanent alimony retroactive to June 1995. However, the original order of June 16, 1995, required T.C. to pay $3,000 per month in alimony commencing July 1, 1995, and continuing until the other financial aspects and provisions were completed. T.C. chose not pay this court-ordered alimony, having determined on his own that he had met the other financial provisions under the court order. The chancery court later determined that T.C. had not and, on August 9, 1996, held him in contempt for failing to make the alimony payments. It was not until December 2000 that T.C. agreed to pay Sheila the $35,580 to resolve the issue surrounding her share of the business. There was, therefore, a valid order dated June 16, 1995, requiring T.C. to pay alimony in the amount of $3,000 per month. Interest could run on the nonpayment of the alimony from and after the date each payment was due.[21]

*1145
B. 1996 Garnishments

¶ 40. Next, T.C. argues he should receive credit for two garnishments issued in 1996. The chancery court released $10,827.68 from T.C.’s SouthTrust bank account by an order entered August 13,1997, and later released $2,222.37 from T.C.’s Merrill Lynch account. These two amounts total $13,050, and the order explains that this amount went to the law firm of Oswald and Reed, which represents Sheila.
¶ 41. As Sheila explains, the reason these two payments were not credited in the chancellor’s findings is because these funds went toward the payment of Sheila’s attorney’s fees and appeal costs related to the initial trial, as awarded in prior judgments. This fact is plainly stated in the August 1997 order.[22]

C. Child Support Credited as Alimony

¶ 42. Finally, T.C. argues that $40,000 in child support payments should be credited toward his alimony arrearages. T.C. claims, in an effort to pay his alimony obligation, he continued to pay child support to Sheila in the amount of $500 per month after his daughter’s twenty-first birthday in August 2001. He claims to have paid this amount until August 2005, when his son turned twenty-one years old, or forty-eight months, for a total of $24,000. Additionally, T.C. claims that he continued to pay $500 per month to Sheila in child support for their son, after he reached eighteen years of age, discontinued school, and joined the work force. This period was from January 2003 until August 2005, for a total of $16,000. T.C. thus claims he should be credited with $40,000 for alimony arrearages.
¶ 43. “Absent an agreement to the contrary, a parent is not required to provide for the care and maintenance of his child after that child reaches the age of majority.” Little v. Little, 878 So.2d 1086, 1088 (¶ 7) (Miss.Ct.App.2004) (citing Nichols v. Tedder, 547 So.2d 766, 770 (Miss.1989)). In Mississippi, the age of majority for child care and maintenance orders is twenty-one. Id. (citing Nichols, 547 So.2d at 771). A parent’s support duties also terminate once a child is emancipated before majority. Deborah H. Bell, Mississippi Family Law § 10.09(2) (2005). “Emancipation, as employed in the law of parent and child, means the freeing of a child for all the period of its minority from the care, custody, control, and service of its parents; the relinquishment of parental control, conferring on the child the right to its own earnings and terminating the parent’s legal obligation to support it.” Rennie v. Rennie, 718 So.2d 1091, 1093 (¶9) (Miss.1998) (quoting Caldwell v. Caldwell, 579 So.2d 543, 549 (Miss.1991)). The duty of child support terminates upon emancipation of the child. Miss.Code Ann. § 93-11 — 65(8)(a) (Supp.2011).
¶ 44. In her findings of fact, the chancellor stated that T.C. had presented no evidence of these added child-support payments, and even if he had, there was no evidence Sheila had agreed to accept these payments as partial payment of alimony. Once T.C.’s daughter turned twenty-one years old, under the original order of child *1146 support in the divorce decree of June 1995 ($500 per month per child), child support should have been reduced by $500. In Evans v. Evans, 994 So.2d 765, 769-70 (¶ 15) (Miss.2008), the supreme court held that with global child-support payments for two or more children, the emancipation of one child does not automatically reduce the lump-sum payment, because global child support contemplates a base amount regardless of the number of children, the child-support payment is not based solely on the needs of the children but also on the parent’s ability to pay, and undivided child-support payments overlook the possibility that individual children’s needs vary. Id. (citing Varner v. Varner, 588 So.2d 428, 483 (Miss.1991)). In the case before us, child support was ordered per child, not globally. If T.C. did continue to pay $1,000 per month for child support, he is correct that he should be credited for the amount of his overpayments. “[A] parent should be given credit for child support payments made after a child becomes emancipated.” Andres v. Andres, 22 So.3d 314, 319 (¶ 19) (Miss.Ct.App.2009). In Ligon v. Ligon, 743 So.2d 404, 405, 408 (¶¶ 2, 13) (Miss.Ct.App.1999), we held the chancellor properly ordered a custodial mother to reimburse the payor/father for one-third of payments made after one child was emancipated, where the order provided support of $100 per month per child.
¶45. Our examination of the record reflects that there is some evidence that T.C. made child-support payments after his daughter turned twenty-one years old. At the July 3, 2002 hearing, T.C. testified that he was paying $500 per month in periodic alimony since his daughter had turned twenty-one years old. There was a question whether Sheila’s computation of arrearages credited T.C. with this amount. At the September 2002 hearing, Sheila’s counsel stated that T.C. had made no payments of any type since March 2002. The chancellor called to his attention, however, that an exhibit created by Sheila’s counsel credited T.C. with some of this alimony. The record also contains a letter dated January 18, 2002, from Sheila’s counsel discussing a settlement proposal whereby T.C. would continue to pay Sheila what he had been paying in child support, as alimony, “which he has recently begun doing since [his daughter’s] emancipation.”[23] We take this statement as evidence T.C. had continued to pay $500 per month as alimony in lieu of his daughter’s child support for some period of time. In her 2009 testimony Sheila denied that T.C. made any payments of any nature to her after the March 2002 payment of $319,339.06.
¶ 46. Based upon the record before us, there is documentation that T.C. continued to pay this child-support amount at least from September 2001 until January 2002. Under Ligón, the custodial parent would have an obligation to reimburse the payor for the extra child support. Under the case before us, T.C. would be entitled to a credit against his alimony obligations for this period of time.
¶ 47. T.C. also claims that once his son reached eighteen years of age, his payments of $500 per month child support terminated, because his son discontinued *1147 full-time enrollment in school and entered the work force in January 2003. Sheila’s testimony is, however, that T.C. made no payments of any nature after March 2002. Taking Sheila’s testimony as true, as the chancellor apparently did, any credit to which T.C. would have been entitled by virtue of his payment of an extra $500 per month from September 2001 until January 2002 would be more than offset by the amount he owed Sheila in child support for their son, even if the son were emancipated in January 2003. Further, the transcript of the September 2002 hearing reflects that Sheila’s computations might have already included this credit. Based upon the record before us, we can find no error in the chancery court’s refusal to give T.C. credit for “extra” child support paid. This issue is without merit.
CONCLUSION
¶ 48. The chancellor made careful and thorough calculations regarding the amounts paid and owing in her thirty-six page opinion. It is obvious she made every attempt to credit T.C. with every payment he made. We are mindful that many of the exhibits to the various hearings and the trial are not a part of the record due to Hurricane Katrina and the file having to be reconstructed. The chancellor’s findings of fact are supported by substantial evidence on all but the calculation of ar-rearage as of February 2001. We reverse and remand for further proceedings on this one issue and affirm the remainder of the chancellor’s well-reasoned opinion.
¶ 49. THE JUDGMENT OF THE CHANCERY COURT OF JACKSON COUNTY IS AFFIRMED IN PART AND REVERSED AND REMANDED IN PART FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED IN EQUAL PARTS TO THE APPELLANT AND APPEL-LEE.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., ROBERTS AND MAXWELL, JJ., CONCUR. RUSSELL, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY CARLTON, J. MYERS AND ISHEE, JJ., NOT PARTICIPATING.

. This opinion, Broome v. Broome, 695 So.2d 603 (Miss.Ct.App.1997), was not designation for publication.

. This chancery court settlement is different from a later, confidential, chancery court settlement regarding the sale of Broome Construction.

. Broome, No. 95-CA-01110-COA.

. Several garnishments were entered in the chancery court during the course of this litigation due to T.C.’s refusal to pay the various judgments.

. Sheila filed numerous complaints for contempt, beginning as early as 1995, due to T.C.'s refusal to pay various ordered financial matters.

. T.C. later testified that the balance of the $2,400,000 for his business was never paid by the purchaser, and he filed suit against the purchaser in 2005. In April 2009, he received a substantial sum for the settlement of the lawsuit, although it was considerably less than the amount owed. The details of the settlement and exact amount were placed under seal by the chancery court, and we find no need to disclose it here.

. This amount is $6,000 more than the negotiated amount; T.C. included two months of alimony for February and March 2002.

. This matter was not ruled upon until the October 12, 2009 order, from which this appeal was taken.

. Counsel for Sheila represented that the document had been prepared by his paralegal. At one point, when T.C. claimed he was entitled to a credit for $500 per month payment to Sheila from September 2001 to July 2002 due to the daughter’s emancipation, counsel advised that he would have to determine if that credit was included in the computations, and he would advise the court accordingly.

. During the course of the hearing, the issue of credit for child support arose. Counsel for Sheila took the position that the March 14, 2002 payment "was the last money that [T.C.] paid. No. $3,000 a month, no $500, no nothing.” The chancellor then stated, apparently indicating to an exhibit, "Well, he is credited that here.”

. Broome v. Broome, 841 So.2d 1204 (Miss.Ct.App.2003).

. This figure excludes interest.

. See U.C.C.R. 8.05.

. The chancellor found this amount to be T.C.’s expenses, although it is different from the amount T.C. listed on his financial declaration form, because T.C. testified at trial that he did not have a mortgage, yet he included a mortgage on his list of expenses. Therefore, the chancellor properly deducted it in making her findings.

."The clean hands doctrine prevents a complaining party from obtaining equitable relief in court when he is guilty of willful misconduct in the transaction at issue.” Bailey v. Bailey, 724 So.2d 335, 337 (¶ 6) (Miss.1998) (quoting Calcote v. Calcote, 583 So.2d 197, 199-200 (Miss.1991)). A party is not barred if the failure to perform is impossible. Hooker v. Hooker, 205 So.2d 276, 278 (Miss.1967).

. We have found the “interest” credit without merit. See Issue II.

. The chancellor noted that on January 2001, two writs of garnishment were served on Broome Construction for $267,735.58 for permanent alimony and interest and a second garnishment for $119,629.33 for judgments and interest dating from the August 1996 order and reiterated in the December 2000 order. Merrill Lynch deposited $93,290.27 into the registry of the court in response to a garnishment in February 2001, leaving a remaining balance of $26,339.06 owing for the 1996 and 2000 orders.

. The chancellor appears to have made a mathematical error here of $2,050.70 in favor of T.C. Her calculation of eight-percent interest ($29,990.72) added to the principal ($320,413.70) would result in a balance of $350,404.42 rather than $348,353.78. However, Sheila does not contest this figure.

.The "remaining Judgment balance” in turn consisted of $26,339.06 on the garnishment on judgments as of January 17, 2001, plus eight-percent interest that had allegedly accrued in the amount of $1,766.47. This $1,766.47 is also included in the chancellor’s total of $295,841.11 due as of February 2001. It is not clear over which period of time this interest accrued; the paragraph discussing this amount referenced dates of February 28, 2001, and June 18, 2001. The concluding sentence, however, says that the total including that interest is "as of February 2001.”

. Here, we have subtracted the $1,766.47 interest to June 2001 ($295,841.11 minus $1,766.47 equals $294,074.64).

. The other two issues addressed in the dissent originated in the August 9, 1996 contempt order and were not appealed at that *1145 time. Therefore, they are not properly before us.

. Sheila also points out that there have been three prior appeals in this case, and T.C. never contested the award of $13,050 until the filing of this appeal. Nor has T.C. raised this issue before the chancery court. It is well established that a party is not allowed to raise an issue for the first time on appeal, because to do so prevents the lower court from addressing the alleged error. Ory v. Ory, 936 So.2d 405, 409 (11 9) (Miss.Ct.App.2006). This issue has no merit.

. As additional proof of an alimony credit for child-support payments, T.C. points to Sheila’s 8.05 financial declaration form, which he says was entered as an exhibit at trial, where Sheila’s monthly income is listed as $500 in child support and $500 in alimony. However, this document is not found in the record; T.C. merely included it in his record excerpts. There is no date on the document, no filing stamp, and it is not signed by Sheila. Thus, the record includes testimony that T.C. continued to pay "extra” on child support, but no documentation of it other than the January 18, 2002 correspondence from Sheila's counsel.