# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01201-COA

**MICHAEL ANTHONY GASKIN**                                         **APPELLANT**

**v.**

**ALLISON CHERIE SCOTT GASKIN**                                   **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/2018 |
| TRIAL JUDGE: | HON. JOHN S. GRANT III |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | B. RUTH JOHNSON |
| | MICHELE DAWN BIEGEL |
| ATTORNEYS FOR APPELLEE: | MARK A. CHINN |
| | JANEAH RAY SAKALAUKUS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 04/14/2020 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND C. WILSON, JJ.**

**C. WILSON, J., FOR THE COURT:**

¶1.    The Rankin County Chancery Court granted Allison Cherie Scott Gaskin (Allison) a divorce from Michael Anthony Gaskin (Tony) on the ground of uncondoned adultery. In dividing the marital estate, the chancellor awarded Allison $612,080.57 and Tony $960,964.07. The chancellor also ordered Tony to pay Allison lump-sum alimony of $174,441.75 and $1,000 per month in periodic alimony. Tony now appeals. Finding no error, we affirm the chancery court's judgment.

## FACTS AND PROCEDURAL HISTORY

¶2.    Tony and Allison were married on May 6, 2000. During the course of their marriage,

Tony operated his plumbing company, Gaskin Plumbing, out of the parties' marital home, and Allison worked as a public school teacher until she retired in 2017 due to disability.[1] Despite her disability, Allison has continued to work occasionally as a part-time substitute teacher. The couple had three children, the eldest of whom was emancipated by the time this action was filed. Tony and Allison separated in 2015, and Tony filed for divorce on March 13, 2017. In response, Allison alleged her own counterclaim for divorce on the ground of uncondoned adultery.

¶3. The chancery court held a hearing on the parties' claims on March 7-8, 2018. The court bifurcated the case, hearing the grounds for divorce first and then addressing equitable division of the marital estate, alimony, and child custody and support. Based on the testimony of Tony and his "paramour," who both admitted their adulterous relationship, the chancellor granted Allison a divorce on the ground of uncondoned adultery. Thereafter, the chancellor heard evidence regarding division of the marital estate, alimony, and child custody and support.

¶4. In its "Findings of Fact, Conclusions of Law, and Final Judgment of the Court" entered April 16, 2018, the chancellor set forth his findings as to the parties' remaining claims. The chancellor first valued the parties' marital and nonmarital property. The chancellor then proceeded to divide the marital assets in accordance with *Ferguson*.[2] The

---

[1] Allison suffers from trigeminal neuralgia. The record indicates that she applied for Social Security disability benefits in 2018 during the pendency of this action. But it is not clear from the record whether, or when, she was awarded disability benefits.

[2] *Ferguson v. Ferguson*, 639 So. 2d 921, 925 (Miss. 1994) (discussing the factors a chancellor must consider when distributing a marital estate).

chancellor conducted a detailed *Ferguson* analysis and distributed the marital property accordingly. After the chancellor did so, the value of Tony's marital assets totaled $960,964.07, and Allison's portion of the marital estate was valued at $612,080.57—a difference of $348,883.50 in Tony's favor. To balance the parties' shares of the marital estate, the chancellor ordered Tony to pay Allison lump-sum alimony of $174,441.75.

¶5. After valuing and dividing the marital estate, the chancellor found that the *Armstrong* factors[3] warranted payment by Tony to Allison of $1,000 per month in periodic alimony. In making this finding, the chancellor placed "great emphasis on the difference between the monthly income and expenses of the parties," noting that Tony's monthly income was approximately $12,085, whereas Allison's was only about $500. The chancellor also stated that Allison's physical disability was a "significant factor" in his award of spousal support. The chancellor reasoned that Tony did not suffer from any health problems that impacted his ability to work, while Allison's physical condition made her ability to maintain full-time employment "questionable."

¶6. The chancellor then turned his attention to the remaining issues of child custody and support. The chancellor conducted a detailed *Albright* analysis[4] and determined that it was in the minor boys' best interest for Allison to be awarded sole physical custody with the parties sharing joint legal custody, and Tony enjoying visitation rights. Applying the

---

[3] *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993) (detailing factors to be considered by courts when awarding alimony).

[4] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983) (enumerating factors to be considered by chancellors when determining child custody).

statutory guidelines, the chancellor set Tony's monthly child-support obligation at $2,417.16. The chancellor also ordered Tony to continue to maintain his Farm Bureau Life Insurance policy with death benefits of at least $900,000 "to guarantee the support of the minor boys" until they were both emancipated. Lastly, the chancellor found that "[e]ach party shall be responsible for his or her own attorney fees and expert witness fees, as no *McKee* factors[5] proof was introduced sufficient to warrant the award of said fees to either party."

¶7.     Following the entry of the chancery court's final judgment, Tony filed a "Motion to Alter or Amend Findings of Fact, Conclusions of Law, and Final Judgment of the Court" pursuant to Rule 59 of the Mississippi Rules of Civil Procedure on April 26, 2018. After a hearing, the chancery court entered an "Order Granting, in Part, Reconsideration of Visitation and Denying Remaining Relief" on July 25, 2018. In this order, the chancellor amended the final judgment to allow additional visitation "as long as the additional visitation [did] not interfere with familial activity or . . . pose an obstacle or problem with other scheduled activities." The chancellor denied all the other relief Tony sought in his Rule 59 motion.

¶8.     Tony now appeals, arguing that the chancellor erred in (1) determining that Tony's expert's testimony regarding the valuation of Allison's PERS retirement account was "highly speculative"; (2) ordering Tony to maintain a $900,000 life insurance policy during his boys' minority; (3) determining that Allison's inherited property was not marital property; (4) dividing the marital estate; (5) awarding alimony; and (6) ordering the parties to pay for their

---

[5] *See McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982) (detailing guidelines to be considered by courts when determining reasonableness of attorney fees).

own expert witness fees.[6]  Finding no error, we affirm.

STANDARD OF REVIEW

¶9.     "This Court employs a limited standard of review of property division and distribution in divorce cases."  *Crew v. Tillotson*, 282 So. 3d 776, 782 (¶22) (Miss. Ct. App. 2019) (quoting *Parrish v. Parrish*, 245 So. 3d 519, 522 (¶5) (Miss. Ct. App. 2017)).  "We will not disturb a chancellor's findings unless the court was manifestly wrong, abused its discretion[,] or applied an erroneous legal standard."  *Williams v. Williams*, 56 So. 3d 1277, 1280 (¶12) (Miss. Ct. App. 2011).  However, questions of law are reviewed de novo.  *Broome v. Broome*, 75 So. 3d 1132, 1139 (¶19) (Miss. Ct. App. 2011).

DISCUSSION

I.      **Whether the chancellor erred in determining that Tony's pension-expert's testimony was "highly speculative."**

¶10.    Tony contends that the chancellor erred in "wholly disregarding" his pension-expert's testimony as "highly speculative."  On our review of the record, we find no abuse of discretion by the chancellor and conclude that this issue lacks merit.

¶11.    The chancellor determined that Allison's PERS retirement account was marital property and subject to equitable distribution.  However, when Allison retired from teaching in July 2017, she "cashed in" her PERS retirement account, withdrawing the total balance of $43,582.04 and unilaterally using some of the funds to enroll the couple's younger two children in private school.  During trial, Tony offered a certified public accountant, Joseph

_____

[6] Tony raises nine specific issues on appeal.  For brevity, we have combined several of the issues for purposes of our analysis.

5

Hines, to provide expert analysis regarding the value of Allison's retirement account. Hines opined that the present value of Allison's retirement account was $188,118.58, not the lower amount Allison withdrew. In making his calculation, Mr. Hines "assum[ed] . . . that Allison had not cashed out her [retirement] account and [assumed] that she lived long enough to draw benefits for a period of time equivalent to the average female lifespan in the United States." But the chancellor found Hines's "valuation to be 'highly speculative' due to the conditions precedent that must occur in order for his valuation to be realized." The chancellor further found that Hines's valuation "would require Allison to not cash out her retirement account, which had already been done[,]" and noted that "Allison is slightly physically disabled and may or may not be able to work until age [sixty]." In light of those findings, the chancellor concluded "that the best estimate of Allison's PERS present value [was] $43,582.04." The court awarded the account proceeds to Allison.

¶12. On appeal, Tony asserts that because Hines was the only expert to testify at trial[7] regarding the value of Allison's PERS account, his testimony should have been accepted by the chancellor as uncontradicted. We disagree.

¶13. "[A] chancellor is in the best position to hear the testimony and view the evidence." *Palmer v. Palmer*, 841 So. 2d 185, 190 (¶19) (Miss. Ct. App. 2003). "Mississippi's chancellors are charged with weighing the evidence presented, and [this Court] will not disturb a chancellor's determination when supported by findings of fact absent manifest error or an abuse of discretion." *Keough v. Keough*, 742 So. 2d 781, 782 (¶5) (Miss. Ct. App.

---

[7] The record indicates that Allison had her own expert present at trial to offer valuation testimony regarding her PERS account, but that expert did not testify.

6

1999).  Here, the record indicates that during trial, the chancellor extensively questioned Hines regarding his $118,118.58 PERS account valuation.  Hines stated that in calculating his valuation, he consulted PERS documents that valued Allison's account at $43,545.92.  When Allison cashed in her retirement account in July 2017, PERS distributed that amount to her.  When questioned by the chancellor about this amount, Hines agreed that $43,545.92 was the account balance based on contributions and earned interest as of July 2017.  The chancellor then asked Hines, "And that's the only value that they're willing to validate, correct?  In other words, there is nothing else in the PERS documents that they've given you saying, 'Well, this $43,000 and change is going to be worth so much down the road.'  This is a calculation you've come up with?"  Hines responded, "[R]ight."

¶14.    Substantial evidence in the record supports the chancellor's findings with regard to the valuation of Allison's PERS account.  It was within the chancellor's discretion to rely on PERS documentation instead of Hines's testimony to value Allison's account.  Accordingly, we find that the chancellor did not abuse his discretion in finding "that the best estimate of Allison's PERS present value [was] $43,582.04."

      **II.**     **Whether the chancellor erred in ordering Tony to maintain his existing life insurance policy for the benefit of the minor children.**

¶15.    In the final judgment, the chancellor ordered Tony to maintain his existing Farm Bureau Life Insurance policy "with death benefits of at least $900,000 during the boys' minority."  The chancellor required continuation of the policy "to guarantee the support of the minor boys," specifying that the "boys shall be listed as the primary beneficiaries until both boys' emancipation or until further order of [the court]."  Tony contends that the

7

chancellor's ruling was in error. Tony reasons that because the life insurance was to "guarantee the support of the minor boys," the policy's death benefits should mirror the total amount of Tony's remaining child support obligations. In monetary terms, Tony calculates that he should only have to maintain a policy with death benefits of $357,115.40, an amount equal to the child support Tony contends he will pay until the boys' emancipations.[8] Tony thus contends that the chancellor abused his discretion by requiring that Tony maintain an insurance policy with death benefits in excess of the amount needed to support the boys in the event of his untimely death.

¶16. In support of his position, Tony relies on *Daniels v. Bains*, 967 So. 2d 77 (Miss. Ct. App. 2007). In *Daniels*, the appellant contended that the county court erred in ordering him to purchase a $500,000 life insurance policy for the benefit of his daughter. *Id*. at 83 (¶20). Daniels argued that the $500,000 policy was excessive because he would only be paying $273,600 in support until his daughter's emancipation. *Id*. But we found "Daniels's attempt to quantify a father's support [ ] unpersuasive" and determined that the chancellor did not abuse his discretion in ordering Daniels to maintain a life insurance policy for his minor daughter. *Id*. at 83-84 (¶¶21-22).

_____

[8] At the time of the parties' divorce, the minor boys were thirteen and sixteen years old. To calculate policy death benefits at $357,115.40, Tony posits that support for the older boy would continue for forty months and support for the younger boy would continue for ninety months, until their respective emancipations. Tony multiplies the current child support for the two boys by forty, which totals $96,686.40. He then adds the amount of child support that he would have to pay for his younger son, presumably half of the current amount, for the remaining fifty months until he is emancipated, which equals $60,429. He then adds $100,000 for each child to cover college expenses. These amounts yield Tony's asserted $357,115.40 in outstanding child-support obligations.

¶17. As in *Daniels*, we find Tony's attempt to quantify his child support obligations unpersuasive. "Parents may be ordered to pay additional amounts over and above child support for additional expenses such as 'health insurance, out-of-pocket medical and other health-related expenses, life insurance, and expenses of a college education.'" *Id*. at 83 (¶21) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 10.07, at 309 (1st ed. 2005)). "[A] father's support is not fully appreciable in a simple financial cost-benefit analysis"; to the contrary, "a father's overall support transcends mere financial support." *Id.* at 84 (¶22).[9] We thus find that the chancellor did not abuse his discretion in ordering Tony to maintain a $900,000 life insurance policy prior to his boys' emancipations.

### III. Whether the chancellor erred in determining that certain property inherited by Allison was not marital property.

¶18. During the course of the marriage, Allison inherited interests in two parcels of land: the first was a fourteen-acre tract of land referred to by the parties as the "White House property," and the second was a sixty-five-acre tract located at 3506 Highway 18 in Rankin County. The chancellor determined that the White House property had been commingled and converted to marital property because Tony had purchased Allison's brother's one-half interest in the property and had "made significant contributions in maintaining the property."

---

[9] The other cases on which Tony relies to support his position are distinguishable because they address life insurance ancillary to alimony obligations. *See, e.g.*, *Ali v. Ali*, 232 So. 3d 770, 777 (¶22) (Miss. Ct. App. 2017) (finding that chancellor erred in ordering husband to maintain life insurance valued at $2 million, when wife was to receive $1.5 million in the event of husband's untimely death, because that amount was excessive when combined with husband's $5,500 monthly alimony payments). Here, the chancellor ordered Tony to maintain the life insurance policy at issue on the minor boys' behalf, not for Allison's benefit.

9

The chancellor further found that the property "ha[d] been used by Tony and the boys for hunting and fishing." The White House property was valued at $160,000, and the chancellor awarded the property to Allison as part of the division of marital assets.

¶19. Regarding the sixty-five-acre tract of land located at 3506 Highway 18, Tony testified that he occasionally bush-hogged the property and stored some Gaskin Plumbing equipment on the property. The parties stipulated that the total value of this parcel was $607,000. In contrast to the White House property, the chancellor found that the sixty-five-acre parcel Allison inherited had not been "commingled to the extent necessary to classify it as marital property for the purpose of division between the parties."

¶20. On appeal, Tony asserts that the chancellor erred in finding that the sixty-five-acre tract of land constituted nonmarital property. He contends that the evidence was clear that he spent substantially more time and effort maintaining the sixty-five-acre property than he did maintaining the White House property. Tony also asserts that he would hunt, fish, and play sports on the sixty-five-acre tract with the boys. He contends that these activities effectively commingled the property and converted it to marital property, not Allison's separate nonmarital property.

¶21. "When dividing marital assets, the chancery court must first classify the property as marital property or nonmarital property." *McDonald v. McDonald*, 115 So. 3d 881, 885 (¶12) (Miss. Ct. App. 2013) (citing *Stewart v. Stewart*, 864 So. 2d 934, 937 (¶12) (Miss. 2003)). "Marital property is defined as 'any and all property acquired or accumulated during the marriage. Assets so acquired or accumulated during the course of the marriage are

10

marital assets and are subject to an equitable distribution by the chancellor.'" *Id.* By contrast, "[i]nter vivos gifts and inheritances are considered nonmarital property unless they have been commingled." *Id.* at 886 (¶12) (citing *Everett v. Everett*, 919 So. 2d 242, 247 (¶19) (Miss. Ct. App. 2005)). "Assets which are classified as nonmarital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic purposes, absent an agreement to the contrary." *Stewart*, 864 So. 2d at 937 (¶12) (quoting *Boutwell v. Boutwell*, 829 So. 2d 1216, 1221 (¶20) (Miss. 2002)).

¶22. Importantly, "we will not substitute our own judgment for that of the chancellor." *McDonald*, 115 So. 3d at 886 (¶16). Here, we cannot say that the chancellor erred in finding that the sixty-five-acre property inherited by Allison and her brother remained nonmarital property despite Tony's assertions that he spent substantial time maintaining the parcel and that he spent time on the property with the couple's boys. The chancellor found that Tony's occasional bush-hogging, equipment storage, and recreational activities with the family were not sufficient to commingle the property with the parties' marital assets, such that the land should be classified as marital property for the purpose of equitable division. We find that the chancellor did not abuse his discretion in treating the sixty-five acres as nonmarital property, and this issue is without merit.[10]

---

[10] Conversely, Tony takes issue with the chancellor's finding that the parties' marital home was wholly a part of the parties' marital estate and thus subject to equitable division. Specifically, Tony contends that the chancellor should have "apportioned" the value of the home between marital property and his own nonmarital property because he purchased the home two years before the parties' marriage. But there was substantial evidence for the chancellor to determine that the marital home had become, in its entirety, a marital asset by

**IV.    Whether the chancellor erred in dividing the marital estate.**

¶23.    Tony further contends that the chancery court erred in its application of the *Ferguson* factors and thus in the division of the marital estate.  Tony takes issue with the court's specific allocation of certain assets, as well as the chancellor's more general application of the *Ferguson* factors.  As to both, we find no error in the chancellor's ruling.

¶24.    The *Ferguson* framework for dividing marital property is well-established, in that chancellors are instructed to consider the following factors:

> 1.  Substantial contribution to the accumulation of the property. Factors to be considered in determining contribution are as follows:
>
>> a.  Direct or indirect economic contribution to the acquisition of the property;
>>
>> b.  Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties and duration of the marriage; and
>>
>> c.  Contribution to the education, training or other accomplishment bearing on the earning power of the spouse accumulating the assets.
>
> 2.  The degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise.
>
> 3.  The market value and the emotional value of the assets subject to distribution.
>
> 4.  The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the

---

the time of the parties' divorce.  Both Allison and Tony had lived in the home with their children for fifteen years prior to the parties' separation.  Allison and the children continued to live in the home after the parties' separation.  Therefore, the chancellor did not err either in determining that the marital home fully constituted marital property, or in awarding the home to Allison.

parties and property acquired by inheritance or inter vivos gift by or to an individual spouse;

5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution;

6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties;

7. The needs of the parties for financial security with due regard to the combination of assets, income and earning capacity; and,

8. Any other factor which in equity should be considered.

*Ferguson*, 639 So. 2d at 928. Here, the chancellor valued the marital estate at approximately $1.5 million. The chancellor awarded Tony assets valued at $960,964.07 and Allison assets totaling $612,080.57. To balance the parties' shares of the marital estate, the chancellor ordered Tony to pay Allison lump-sum alimony of $174,441.75.

¶25. Tony first argues that the chancellor erred in awarding him certain marital assets, namely a Honda CRV and the parties' Wyndham timeshare. The chancellor valued the Honda CRV at $10,541. The court found that even though the vehicle was driven by the parties' eldest child, the vehicle was titled in Tony's name, and Tony made the payments on the vehicle. The parties did not offer any evidence at trial of the current market value of the Wyndham timeshare. The chancellor valued the Wyndham timeshare at $26,100, which was the purchase price Tony paid for it in 2010. The chancellor found that Tony had purchased the timeshare using marital funds and had been paying the $62 monthly fee on the property.

¶26. Tony contends that awarding him these assets was inequitable because the assets inflated his share of the marital estate and thereby increased the lump-sum payment he was

13

ordered to make to Allison. However, the objective of equitable distribution is a fair division of the marital estate based on the facts of the case. *See Ferguson*, 639 So. 2d at 929. In meeting that objective, the Mississippi Supreme Court has repeatedly held that chancery courts are not required to divide marital property equally. *E.g.*, *Love v. Love*, 687 So. 2d 1229, 1232 (Miss. 1997); *Trovato v. Trovato*, 649 So. 2d 815, 817-18 (Miss. 1995); *Davis v. Davis*, 638 So. 2d 1288, 1292 (Miss. 1994).

¶27.  Regardless, we cannot conclude that the chancellor was manifestly wrong in awarding Tony the Honda CRV or Wyndham timeshare. The vehicle was titled in Tony's name, and Tony made the monthly payments on it; likewise, Tony bought the Wyndham timeshare with marital funds and continued paying the monthly timeshare fees. We find that the chancellor acted within his discretion in awarding these assets to Tony.

¶28.  More broadly, Tony contends that the chancellor's *Ferguson* analysis was flawed and thus must be set aside. He takes issue with the chancellor's findings that Tony had dissipated assets by using marital funds to purchase a home while he was having an extramarital relationship. Tony also contends that the chancellor failed to consider that the separation of the parties may not have been due to adultery on Tony's part; that Allison's fault or misconduct affected the stability of the marriage; and that Tony owned the marital home two years before the marriage and had at least $8,000 in nonmarital assets in the home.

¶29.  Notwithstanding the foregoing issues raised by Tony on appeal, we find no manifest error in the chancellor's *Ferguson* findings. To the contrary, the chancellor conducted a detailed analysis, finding that (1) both parties made direct and indirect contributions to the

14

accumulation of marital property; (2) Tony's extramarital affair contributed significantly to the destabilization of the marriage; (3) Tony contributed financially to Allison's college education; (4) Allison dissipated marital assets by cashing in her PERS account; and (5) Tony dissipated marital assets by purchasing a home while the parties were separated. Moreover, in applying *Ferguson*, the chancellor also considered the properties Allison had inherited, the economic consequences of distribution, and the extent to which the division of the estate would reduce the need for periodic payments and reduce friction between the parties. Finally, the court fully considered the parties' relative financial security and earning capacities, particularly including the impact Allison's health would have on her ability to support herself. Our review of the record supports the chancellor's thorough findings regarding the marital estate and the court's equitable division thereof. Accordingly, we find no reversible error in the chancellor's *Ferguson* analysis or his resulting division of the marital estate.

### V. Whether the chancellor erred in awarding alimony.

¶30. After dividing the marital estate, the chancellor weighed whether alimony was warranted in this case. In doing so, the chancellor applied the factors enumerated in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993), and concluded that Tony should pay Allison periodic alimony of $1,000 per month. On appeal, Tony contends that the chancellor erred in awarding Allison periodic alimony. Again, we disagree.

¶31. "When one party will suffer a deficit after the marital property has been equitably divided, alimony should be considered." *Rogillio v. Rogillio*, 101 So. 3d 150, 155 (¶19)

15

(Miss. 2012) (citing *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003)). "The purpose of alimony is not punitive, but instead, is designed to assist the spouse in meeting his or her reasonable needs while transitioning into a new life." *Elliot v. Elliot*, 11 So. 3d 784, 786 (¶8) (Miss. Ct. App. 2009). "Alimony awards are within the discretion of the chancellor, and the amount of alimony to be awarded is a matter also committed to the discretion of the chancery court because of the chancellor's opportunity to evaluate the equities of the particular situation." *Brooks v. Brooks*, 652 So. 2d 1113, 1121 (Miss. 1995) (citations omitted).

¶32.    Here, the chancellor concluded that after division of the marital assets, Allison would be left with a significant deficit, such that she was entitled to alimony. The chancellor "place[d] a great emphasis on the differences between the monthly income and expenses of the parties." The chancellor noted that Tony's business was very successful and produced "a monthly adjusted gross income stream of approximately $12,085," whereas Allison made a little over $500 per month as a substitute teacher. The chancellor further considered Allison's chronic illness to be "a significant factor" in awarding alimony. The court noted that her condition, trigeminal neuralgia, made her ability to maintain full-time employment "questionable" and, even if she returned to full-time teaching, "her ability to produce an income stream comparable to that of Tony's would be highly unlikely." The record amply supports each of these findings, such that we find no error in the chancellor's award of periodic alimony to Allison, either in its necessity or its amount.

## VI.    Whether the chancellor erred in ordering the parties to pay their own expert witness fees.

¶33.    In his final judgment, the chancellor ordered that "each party shall be responsible for

his or her own attorney fees and expert witness fees, as no . . . proof was introduced sufficient to warrant the award of said fees to either party." Tony contends that he should not have to pay the entire cost of his expert fees. Rather, he asserts that these fees should be classified as marital debt and distributed between the parties because these experts were necessary to value the marital estate. But both parties retained their own experts to value the marital estate, and the record is devoid of any evidence to suggest an inability to pay. *Cf. Wells v. Wells*, 800 So. 2d 1239, 1246 (¶15) (Miss. Ct. App. 2001) (citation omitted) (stating that when a party is able to pay attorney fees, an award of attorney's fees to that party is not appropriate). We therefore find that the chancellor did not abuse his discretion in ordering the parties to bear their own attorney and expert witness fees.

CONCLUSION

¶34.   After our careful review of the record, we find no reversible error in the chancellor's valuation and division of the marital estate between the parties. We likewise find no error in the chancellor's decision to award lump-sum and periodic alimony to Allison. To the contrary, the chancellor carefully and thoroughly applied the *Ferguson* and *Armstrong* factors and did not abuse his discretion in the related findings. We accordingly affirm as to all issues on appeal.

¶35.   **AFFIRMED.**

   **BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE AND McCARTY, JJ., CONCUR.**