919 So.2d 242 (2005)
Peggy Diane EVERETT, Appellant/Cross-Appellee,
v.
Harmon G. EVERETT, Jr., Appellee/Cross-Appellant.
No. 2003-CA-02553-COA.
Court of Appeals of Mississippi.
June 28, 2005.
*244 Eugene A. Perrier, Vicksburg, attorney for appellant.
Allen Lamar Burrell, Robert Binnon Andrews, Port Gibson, attorneys for appellee.
Before BRIDGES, P.J., CHANDLER and ISHEE, JJ.
CHANDLER, J., for the Court.
¶ 1. Harmon Everett and Peggy Everett were granted a divorce. Unable to reach an agreement regarding the division of their marital property, the Claiborne County Chancery Court divided the assets of the parties. Peggy appeals, raising the following issues:
I. WHETHER THE TRIAL COURT ERRED IN AWARDING TITLE, USE, AND POSSESSION OF THE MARITAL HOME AND SURROUNDING PROPERTY TO HARMON
II. WHETHER THE TRIAL COURT ERRED IN GIVING HARMON CREDIT FOR ONE-HALF OF THE VALUE OF THE ALLIANZ JOINT ANNUITY
¶ 2. Harmon cross-appeals, raising the following issues:
III. WHETHER THE COURT ERRED IN FINDING THAT HARMON'S STOCKS WERE A MARITAL ASSET
IV. WHETHER THE COURT ERRED IN ITS EQUITABLE DIVISION OF THE MARITAL ASSETS BY INCLUDING HARMON'S STOCKS AS MARITAL ASSETS AND PROVIDING FOR AN EQUAL DISTRIBUTION OF THE MARITAL ASSETS
¶ 3. Finding no error, we affirm on both direct appeal and cross-appeal.

FACTS
¶ 4. Harmon Giles Everett, Jr. and Peggy Diane King Everett were married on May 31, 1975. There were no children born from this marriage, but Harmon has adult children by a previous marriage. Harmon is twenty-three years older than Peggy. Less than one year after the parties were married, Harmon retired from Eli Lilly, where he worked as a pharmacist. Some time in 1977, Harmon began driving a truck. Peggy, who had recently graduated from pharmacy school, quit working to help him.
¶ 5. From 1977 until 1989, Harmon was the family's only income earner. From 1977 until 1986, Harmon and Peggy did not have a permanent residence because they lived in their truck. In 1986, Harmon and Peggy moved in with Harmon's mother in Hermanville, Mississippi. The home eventually became the party's marital domicile. The land, which totaled twenty acres, was purchased by Harmon's father in 1937, and the home was built by Harmon's father in the early 1970s. After 1989, Harmon retired from trucking, and he and Peggy lived off the income Harmon had made as a trucker.
¶ 6. In 1998, Harmon deeded the house and eleven acres of property to Peggy. He reserved a life estate for himself and retained nine acres. Thereafter, Peggy used her inheritance to make renovations *245 on the home. She testified that she spent more than $26,000 from the inheritance she received from her mother to renovate the house, and she had plans to make additional improvements.
¶ 7. Peggy was forced out of the marital home on July 3, 2002, when Harmon poured ice water on her while she was asleep and threatened to destroy her sewing machines and computer. She returned to the home on July 14, 2002, accompanied by sheriff deputies. Harmon told her that she was no longer welcome in the home. She filed for divorce on July 22, 2002. The parties were unable to agree to a property settlement. A trial was held on July 9 and 10, 2003, for the purpose of dividing the marital property.
¶ 8. The chancellor determined the following assets were marital property and valued them accordingly: (1) a joint annuity from Allianz, valued at $84,675; (2) stocks held by Harmon, valued at $36,683; (3) a bond issued by Harris County in Harmon's name, valued at $5,000; (4) an annuity from Allianz held by Harmon, valued at $9,096; (5) an IRA held by Harmon, valued at $3,479; (6) a Roth annuity held by Peggy, valued at $8,264; (7) a brokerage account held by Peggy, valued at $2,982 and (8) the parties' marital domicile, valued at $140,250.
¶ 9. The chancellor awarded to Harmon the marital domicile, the stocks held in Harmon's name, the Harris County bond, and the annuity and IRA held in his name. Peggy received the joint annuity, as well as the Roth annuity and the brokerage account that were titled in her name. Each party received half of the value of the marital estate. Accordingly, the chancellor ordered Harmon to pay $49,293.50 to Peggy to compensate her for her interest in the marital domicile, payable within thirty days of his order.

ANALYSIS

Standard of Review
¶ 10. The chancellor's findings will not be disturbed unless the chancellor was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Bell v. Parker, 563 So.2d 594, 596-97 (Miss.1990) (citations omitted). A chancellor's division and distribution of marital property will be upheld if it is supported by substantial credible evidence. Owen v. Owen, 798 So.2d 394, 397 (¶ 10) (Miss.2001) (citing Carrow v. Carrow, 642 So.2d 901, 904 (Miss.1994)). The chancellor's decision will be viewed as a whole in determining whether the chancellor abused his discretion. Tillman v. Tillman, 716 So.2d 1090, 1094 (¶ 19) (Miss.1998).

I. WHETHER THE TRIAL COURT ERRED IN AWARDING TITLE, USE, AND POSSESSION OF THE MARITAL HOME AND SURROUNDING PROPERTY TO HARMON
¶ 11. Peggy does not contest the chancellor's findings regarding the classification or valuation of the marital and non-marital property. She argues that she should be awarded the marital home because she spent a great deal of time and money renovating the home. Peggy alleges that Harmon has failed to maintain the premises in a respectable and responsible manner. Peggy claims to have the same emotional attachment to the marital domicile as Harmon because of her efforts to care for, maintain, and preserve the premises.
¶ 12. The chancellor divided the Everetts' marital property based on the guidelines of Ferguson v. Ferguson, 639 So.2d 921 (Miss.1994). Ferguson provides guidelines for chancellors to consider in effecting an equitable division of marital *246 property. These factors include the contribution to the accumulation of property; the degree to which each spouse has expended, withdrawn, or otherwise disposed of marital assets and any prior distribution of assets; the value of assets not ordinarily subject to distribution, such as property brought into the marriage by the parties or acquired by inheritance or inter vivos gift; economic consequences of the division; the extent to which property may be used to eliminate periodic payments and sources of future friction between the parties; the needs of the parties for financial security; and any other factor which in equity should be considered. Id. at 928. A failure to explicitly recite each Ferguson factor does not mandate a reversal of a chancellor's judgment. Hammers v. Hammers, 890 So.2d 944, 955 (¶ 41) (Miss. Ct.App.2004) (citing Glass v. Glass, 857 So.2d 786, 790 (¶ 10) (Miss.Ct.App.2003)). However, a chancellor's findings must be specific enough to allow this Court to find that the factors were considered. Id.
¶ 13. Peggy argues that the chancellor failed to consider the economic consequences of the property division. Peggy contends that the chancellor erred in awarding the marital property to Harmon because Harmon is unable pay Peggy the $49,293.50 to comply with the chancellor's order. According to Peggy, Harmon has already conveyed his stocks to his children, he has no other available assets, and he has expenses that exceed his income. By contrast, Peggy has the ability to pay Harmon without selling or encumbering the marital domicile. She has resumed her profession as a pharmacist and has a non-marital estate that was valued at $137,031.72.
¶ 14. When the chancellor divided the property and awarded the marital domicile to Harmon, he considered the fact that Harmon is unlikely to be able to secure employment in the future and has an income consisting solely of his social security and Eli Lilly pension, totaling $1,298 per month. Based on Harmon's limited income, it is unlikely that he would be able to afford another suitable residence. The chancellor also considered the fact that Harmon was seventy three years old at the time of the judgment and in poor health, therefore imposing a hardship on Harmon if he were forced to move. In addition, the chancellor considered the fact that Harmon has a strong emotional attachment to the home and to the land because they were purchased by his father.
¶ 15. After the chancellor divided the parties' marital property, Peggy filed a motion for reconsideration. In that motion, Peggy argued that Harmon had insufficient funds to buy out Peggy's interest in the property, while Peggy did have the means to carry out that part of the court's order. In response to Peggy's motion for reconsideration, Harmon indicated that he has been saving money and obtaining help from his family. The marital domicile is currently free of any mortgages, and he also indicated that he would mortgage the property, if necessary, to comply with the chancellor's order. The chancellor clearly considered the economic consequences of allowing Harmon to keep the marital domicile. The chancellor followed Ferguson in awarding the marital domicile to Harmon, and we affirm.

II. WHETHER THE TRIAL COURT ERRED IN GIVING HARMON CREDIT FOR ONE-HALF OF THE VALUE OF THE ALLIANZ JOINT ANNUITY
¶ 16. Peggy does not dispute the chancellor's finding that the Allianz annuity is marital property, but she challenges the decision to give Harmon credit for half *247 of the value of the annuity. Peggy argues that, because the annuity was purchased with marital funds, the annuity should remain in the exclusive property of Peggy because the purpose of the annuity was to compensate Peggy and provide her a retirement benefit in recognition of her contributions to the marriage. Peggy argues that the annuity was obtained in consideration for Peggy's decision not to pursue her career as a pharmacist or engage in any gainful employment during the marriage.
¶ 17. This Court has held that an interspousal transfer of marital property does not deprive the property of its status of a marital asset. Myrick v. Myrick, 739 So.2d 432, 434 (¶ 5) (Miss.Ct.App.1999). Because the annuity is a marital asset, the division of the annuity is subject to the sound discretion of the chancellor. Arthur v. Arthur, 691 So.2d 997, 1003 (Miss.1997). The funds used to purchase the annuity were acquired through the efforts of both parties from Harmon's employment as a truck driver. There is substantial evidence that the parties contributed equally to the acquisition of this asset and that it should therefore be divided equally.
¶ 18. To support her position that Harmon should not receive credit for the annuity, Peggy uses Tillman v. Tillman, 716 So.2d 1090 (Miss.1998). However, Tillman actually supports Harmon's claim that he is entitled to an equitable interest in the annuity. The Mississippi Supreme Court explicitly stated, "[A] spouse who has made a material contribution toward the acquisition of the asset titled in the name of the other may claim an equitable interest in such jointly accumulated property." Id. at 1093-94 (¶ 15) (citations omitted). In this case, Harmon made contributions to the annuity by earning the funds that were used to purchase the annuity. The chancellor did not err in finding that Harmon was entitled to an equitable distribution of the annuity.

CROSS-APPEAL

III. WHETHER THE COURT ERRED IN FINDING THAT HARMON'S STOCKS WERE A MARITAL ASSET
¶ 19. During the course of the marriage, Harmon had received significant funds from his mother and his aunt. He received a series of inter vivos gifts from his mother and a sizable inter vivos gift from his aunt shortly before she died. He claims to have used these funds to purchase stocks that were titled solely in his name, and he claims to have paid for these stocks from a separate account to which Peggy did not have access. Harmon argues that the stocks should have been classified as separate property. Inter vivos gifts and inheritances are separate property until co-mingled. Heigle v. Heigle, 654 So.2d 895, 897 (Miss.1995).
¶ 20. "Assets accumulated during the marriage are subject to equitable distribution, unless it can be shown by proof that the assets are attributable to the separate estate prior to the marriage or outside the marriage." Hemsley v. Hemsley, 639 So.2d 909, 914 (Miss.1994). The burden of proof is on the person claiming the assets to be non-marital to demonstrate their non-marital character. A & L, Inc. v. Grantham, 747 So.2d 832, 839 (¶ 23) (Miss.1999).
¶ 21. Harmon testified that he received a series of inter vivos gifts from his mother over a period of seven or eight years. Harmon admitted that the bulk of these funds were used for the purpose of supplementing the parties' living expenses. Harmon also testified that he received approximately $78,000 from his aunt in 2002, approximately one year before her death *248 on February 28, 2003. Harmon never introduced any evidence to show that he inherited money from either his aunt or his mother. He was unable to testify as to the exact amount of money he received in inter vivos gifts from either person. He did not provide documentation that he deposited $78,000 in early 2002 from his aunt, nor did he produce documentation that he received any funds from his mother. The only documentation admitted into evidence showing that Harmon purchased stock were copies of seven checks drawn on the Mississippi Southern Bank from 1999 to 2002, totaling approximately $43,000. Peggy testified that she never knew of any inheritance received by Harmon from his aunt. It was Peggy's understanding that Harmon's aunt and uncle never had any money, and Harmon never told Peggy of his inheritance.
¶ 22. The source of funds used to purchase the stocks was Harmon's bank account at Mississippi Southern Bank, an account which was titled in Harmon's name alone. Harmon argues that the source of the funds were non-marital in origin because he claims that Peggy never had access to this account. However, the evidence shows that Peggy did have access to this bank account, which demonstrates that the funds used to purchase the stock were co-mingled assets. Peggy testified that she wrote checks from the account at Mississippi Southern Bank, which Harmon did not deny. Peggy testified that the money Harmon earned from driving a truck was deposited into that account. The money Harmon earned as a truck driver is clearly marital property. See Stewart v. Stewart, 864 So.2d 934, 937 (¶ 12) (Miss.2003) (citing Hemsley, 639 So.2d at 915) (marital property for the purpose of divorce proceedings is any and all property accumulated during the marriage). Therefore, the funds deposited and withdrawn from the Mississippi Southern Bank are co-mingled assets, thus supporting the finding that the stocks are marital property. Harmon failed to show that the money he used to purchase his stocks originated from the inter vivos gifts he received. The chancellor was within his discretion in characterizing Harmon's stocks as marital property.
¶ 23. Harmon argues that this Court should consider Peggy's inheritance to be marital property because Peggy has used part of her inheritance to renovate the marital domicile. We find no merit in this argument. Harmon's inter vivos gifts were held to be marital property because he was unable to identify the source of the funds he received as inter vivos gifts. Peggy's inheritance consists of a half interest in her parents' residence in Monroe, Louisiana, valued at $23,250; a half interest in an account at Ouachita Independent Bank, valued at $741; and her mother's account with American National Insurance Services, valued at $113,040.72. Harmon has no interest in any of these assets and no access to any of the accounts. Peggy holds the cash assets she received from her inheritance in the same bank accounts that her mother held. Therefore, there is no question as to the origin of these assets. The chancellor was correct in finding that Peggy's inheritance was her separate property.

IV. WHETHER THE COURT ERRED IN ITS EQUITABLE DIVISION OF THE MARITAL ASSETS BY INCLUDING HARMON'S STOCKS AS MARITAL ASSETS AND PROVIDING FOR AN EQUAL DISTRIBUTION OF THE MARITAL ASSETS
¶ 24. Harmon argues that the distribution was clearly inequitable towards him. He argues that the trial court *249 erred in dividing the marital assets equally. He correctly notes that an equitable distribution of property does not necessarily mean an equal distribution of property. Trovato v. Trovato, 649 So.2d 815, 818 (Miss.1995). As support for his argument that he should receive a greater share of the marital property, Harmon reminds this Court that he is seventy three years old, has numerous health problems, and is unable to re-join the workforce. Peggy, by contrast, is only fifty one years old, a licensed pharmacist, is in good physical health, and is able to earn social security and retirement benefits.
¶ 25. Harmon accuses Peggy of spending $30,000 cash from the parties' joint safe deposit box during the parties' separation. However, Peggy claims that she never knew about the money. The first time Harmon made this accusation was at trial. Peggy testified that Harmon was in control of the parties' finances during the marriage, and Harmon never discussed with Peggy the assets he held.
¶ 26. Harmon also asserts that he should receive a greater share of the marital property because Peggy has a sizable non-marital estate, whereas Harmon has no separate estate except for his Eli Lilly pension. Under Ferguson, the chancellor should consider the parties' respective non-marital estates when dividing the marital property. Ferguson, 639 So.2d at 928. In the case sub judice, the chancellor did consider Peggy's inheritance and Harmon's needs due to his age and health when he divided the marital property. The chancellor specifically mentioned in his opinion that Peggy has a separate estate valued at $137,000, and he also mentioned that Harmon is not likely to become employed again because of his age and health. He also noted that Peggy is in good health and able to earn a good living as a pharmacist.
¶ 27. The chancellor's decision to divide the marital property equally was supported by substantial evidence. The chancellor made several findings of fact that support his order to divide the marital property equally. Peggy spent most of her adult life outside the workforce, and neither party was employed at the time of trial. From 1987 to 1996, Peggy helped take care of Harmon's mother. Peggy added to the value of the marital domicile by spending part of her inheritance to renovate the marital domicile and keeping the home clean and in good repair. She allowed Harmon to handle all the finances of the marriage and depended on Harmon's financial support throughout the marriage.
¶ 28. The chancellor's order to divide the marital property equally was supported by substantial credible evidence. Peggy spent the majority of her life taking care of Harmon and his mother. She is over fifty years of age, she must relearn her skills as a pharmacist, she must support herself for the first time in her life, and she must find a new home. The chancellor's division of property was supported by the evidence.
¶ 29. THE JUDGMENT OF THE CHANCERY COURT OF CLAIBORNE COUNTY IS AFFIRMED ON BOTH DIRECT APPEAL AND CROSS-APPEAL. COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN APPELLANT AND APPELLEE.
KING, C.J., BRIDGES AND LEE, P.JJ., IRVING, MYERS, GRIFFIS, BARNES AND ISHEE, JJ., CONCUR.